# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| IN RE: <br><br> JOSEPH ANTHONY DOWDALL <br><br> Debtor | Case No. 24-42950 <br> Chapter 7 |
| MMWKM ADVISORS, LLC, <br><br> Plaintiff, <br><br> *v.* <br><br> JOSEPH ANTHONY DOWDALL, <br><br> Defendant. | Adversary No. |

**COMPLAINT TO DETERMINE DISCHARGEABILITY**

Creditor/Plaintiff MMWKM ADVISORS, LLC ("Creditor-Plaintiff") sues Debtor/Defendant Joseph Anthony Dowdall (collectively, "Debtor-Defendants"), pursuant to 11. U.S.C. §§ 523 and 727 and Federal Rule of Bankruptcy Procedure 7001, and show the Court as follows:

## I. PARTIES AND JURISDICTION

1. On December 5, 2024, Debtor-Defendant initiated the bankruptcy case *In re: Joseph Anthony Dowdall*, under Chapter 7, Title 11, Bankruptcy Case No: 24-42950, which is currently pending in this Court, the Eastern District of Texas, Sherman Division (the "Main Case").

2. Creditor-Plaintiffs bring this adversary proceeding pursuant to 11 U.S.C. §§ 523 and 727, as well as Federal Rule of Bankruptcy Procedure 7001, to determine Debtor-Defendant's debt to Creditor-Plaintiff to be non-dischargeable.

3. Debtor-Defendant Joseph Anthony Dowdall resides at 3347 Overhill Drive, Frisco, Texas 75033, is a Debtor before this Court in the Main Case, and is therefore subject to the jurisdiction of this Court.

4. Creditor-Plaintiff MMWKM Advisors, LLC is a creditor of the Defendant and is retirement planning company and a Texas limited liability company whose headquarters is located at 2820 Dallas Pkwy, Plano, Texas 75093.

5. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 727.

6. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

7. Creditor-Plaintiff has standing pursuant to 11 U.S.C. § 523(c)(1).

## II. FACTS

**A. BACKGROUND**

8. Debtor-Defendant Dowdall ("Dowdall") is an individual retirement planner who formerly worked at MMWKM Advisors, LLC also known as Retirement Planners of America ("RPOA") for many years. At RPOA, company founder and senior partner Ken Moraif gradually entrusted Mr. Dowdall with many of his most valuable clients, with Dowdall eventually handling a book of business worth millions of dollars. Moraif is known as the host of the radio show and podcast *Money Matters with Ken Moraif*, and over decades he has turned his company into a marketing and client acquisition juggernaut, supported by a team trusted retirement planners who handle the client accounts.

9. After months of grooming RPOA's clients to move their accounts and secretly plotting with fellow RPOA retirement planner Philip Floyd, on February 5, 2021, Dowdall and Floyd announced their immediate resignation from RPOA. In the months that followed, Dowdall carried out his plan to defalcate as much of RPOA's book of business as possible, betraying the trust placed in him by Moraif. Eventually, Dowdall took accounts with tens of millions of dollars under management by RPOA to Worth Asset Management, LLC, an RPOA competitor that agreed to pay Dowdall 79-80% of the millions of fees charged for managing those accounts' assets in exchange for providing support staff and back-office support.

10. Eventually, Moraif found this out and confronted Dowdall. Having been found out, instead of stopping his betrayal, Dowdall added insult to injury by refusing to pay per contractually agreed-upon formula to buy the book of business he took, which Dowdall agreed to in his Investment Advisor Representative Agreement with RPOA in 2013.

11. His entire business at stake, Moraif authorized initiated an American Arbitration Association proceeding on April 20, 2021, where both sides spent hundreds of thousands of dollars on counsel and asserted claims in both directions.

12. At the conclusion of a four-day hearing in Dallas, Texas, Arbitrators Mark Shank (Chair), Patricia Lehtola, and Corbet F. Bryant, the Panel issued an award that ruled against Respondent Dowdall on all his claims:

> 1. The Panel FINDS that Respondent Joseph Dowdall shall take nothing on his counterclaims. The contractual claim for underpayment was not timely pled and are barred by limitations. Moreover, the parties agreed to a novation which modified Exhibit A of the IAR. Respondent failed to satisfy his burden of proof on each of his counterclaims.

Exhibit 1, Second Amended Arbitration Award, Dated February 10, 2023, at 2.

13. The Panel concluded that the Parties' contractual buyout formula—which would have determined $4,794,595—was excessive:

> 2. The Panel FINDS that the buyout found in Section 9(d) of the IAR Agreement is a liquidated damages clause and is a penalty which fails to meet the liquidated damages requirements set out by the Texas Supreme Court; therefore, it is not enforceable under Texas law.

Exhibit 1, at 2.

14. Instead, the Court awarded damages for RPOA's fiduciary duty and contract claims based on its lower valuation of the book of business taken by Dowdall of $2,766,441:

> 3. The Panels FINDS in favor of Claimant MMWKM Advisors on its remaining causes of action and also FINDS that Claimant MMWKM has suffered damages resulting therefrom in the amount of $2,766,441. The Panel FINDS that Claimant Ken Moraif did not prove that he suffered any damages, in his individual capacity.

15. Altogether, the Panel awarded $3,389,956.80 from Dowdall, plus an additional $82,606.69 in compensation and expenses of the arbitrators:

> 5. Accordingly, the Panel AWARDS Claimant MMWKM Advisors, LLC the amount of $2,766,441 in damages and $460,025 as reasonable and necessary attorney's fees, recoverable of and from Respondent Joseph Dowdall. The Panel further awards Claimant MMWKM Advisors, LLC the amount of $163,490.80 in prejudgment interest as of the date of this award. The total judgment sum in favor of Claimant MMWKM Advisors, LLC against Respondent Joseph Dowdall is therefore $3,389,956.80.

. . .

> 7. The administrative fees and expenses of the American Arbitration Association totaling $3,800.00, and the compensation and expenses of the arbitrators totaling $78,806.69, shall be taxed to Respondent. Therefore, Respondent Joseph Dowdall has to pay Claimant MMWKM, $82,606.69.

Exhibit 1, at 2.

16. The debt is therefore $3,472,563.49, plus approximately $526,672.13 of post-award interest at the 7% simple-interest rate set by the panel, which is $3,999,235.62 today.

17. That debt consists of the loss of the fair value of RPOA's book of business, plus attorneys' fees, arbitration costs, and simple interest awarded by the panel.

18. Not only did Dowdall lose that arbitration, but the Panel found that *he destroyed evidence* and therefore found that an "adverse inference" was justified:

> 6. Respondent's destruction of texts and other evidence, after Respondent was aware that litigation could reasonably be anticipated, justifies an adverse inference as to the content of the destroyed information.

Exhibit 1, at 2.

19. On July 11, 2023, Dallas County 68th District Court Judge Martin Hoffman confirmed and entered judgment on the arbitration award. Exhibit 2, Order Confirming Arbitration Award and Final Judgment.

20. As RPOA eventually discovered in post-judgment proceedings, Dowdall was not done evading accountability, nor is it clear that he has stopped covering his tracks by deleting evidence. During his court-ordered deposition on November 6, 2024, Dowdall admitted to deleting text messages he exchanged with his wife, Leila Dowdall:

```
14    Q.   Okay.  Well, let me ask you that question
15   separately, then.  Between 2021 and the present, have
16   you deleted any text messages between you and Leila
17   Dowdall?
18    A.   Yes.
19    Q.   When did you do that?
20    A.   I don't know.
```

Exhibit 3, Deposition of Joseph Dowdall, at 124:14–20 (highlighting added).

21. Fortunately, thanks to subpoenas sent to Worth Asset Management LLC, enough evidence survives to conclusively prove that Dowdall has squirreled away close to $1 million dollars of his assets to his wife, Leila, both directly and through a company she formed.

22. On November 1, 2022, just days before arbitration, Dowdall was having Worth Asset Management LLC's owner set up payments to an "LLC," LJ Dowdall Financial, LLC:

> From: Jim Clark <jclark@worthassetmgmt.com>
> Sent: Tuesday, November 1, 2022 11:58 AM
> To: Joe Dowdall <joe@worthassetmgmt.com>
> Subject: W-9 form
>
> Joe,
> Please complete the attached W-9 for the LLC and send back to me.
> Thanks,
> Jim
> << File: W-9 form.pdf >>

23. The arbitration final hearing took place one week later:

> 8. The Panel held an in-person evidentiary hearing for 4 days on November 7-10, 2022 in Dallas, Texas. The evidence concluded on November 10, 2022. The parties agreed to provide attorney's fees submissions by November 28, 2022, which they did. The Panel's award was due 30 days thereafter, on December 28, 2022.

Exhibit 1, at 2.

24. The W-9 Dowdall submitted for "LJ Dowdall Financial LLC" to Worth Asset Management, LLC was signed by Leila Dowdall:



Exhibit 4 (redacted).

25. For the avoidance of doubt, the contract between Dowdall and Worth Asset Management LLC at the time of this arrangement was emphatic that it paid Dowdall not wages, which are exempt

from collection:

> **Independent Status With WAM:** Whereas WAM is a Registered Investment Advisor; and whereas IAR desires to engage in investment advisory services and **the parties hereto agree that the IAR conduct such advisory activities as an independent Investment Advisor and not as an employee,** as provided by paragraph 6 of Mimeograph 6656, published by the office of the Commissioner of Internal Revenue in Cumulative Bulletin 1951-1, page 108, subject to such supervisory restrictions as are required by the SEC, Securities Department of your state of residence and other states you are licensed, and other regulatory authorities as are necessary to properly qualify you as an Investment Advisor Representative.

Exhibit 5, at 1 (highlighting and underlining added).

26. As time went on—and running money through the LLC apparently became a hassle—Dowdall started cashing his Worth fee checks and handing the cash to his wife Leila, as he admitted doing in his October 2024 deposition:

```
10       Q.   Okay.  And then eventually -- and then it
11   started paying you directly, and you took -- and you
12   got cashier's checks and handed them to your wife,
13   Leila Dowdall, right?
14       A.   That did occur at some point, yes.
```

Exhibit 3, 85:10–14 (highlighting added).

27. Finally, since April 2024, Dowdall has had his so-called "salary" from Worth deposited directly into Mrs. Dowdall's bank account:

```
15       Q.   Okay.  And then, finally, from April or
16   May 2024 to the present, Worth Asset Management's
17   payments for your involvement with Worth have been
18   directly to Leila Dowdall's bank account, correct?
19       A.   Yes.
```

Exhibit 3, 85:15–19.

28. The evidence will show that through April 24, 2025, Dowdall has siphoned approximately $918,407.69 in collectible assets to thumb his nose at the arbitration panel, Judge Hoffman, and RPOA. Indeed, the below table of payments from Dowdall to his wife is supported by evidence that may not even be contested.

| Date | Payee | Amount | |
|---|---|---|---|
| 2022 | LJ Dowdall Financial | $75,856.48 | |
| 2023 | LJ Dowdall Financial | $323,421.70 | |
| 2023 | Joe -> Leila Dowdall (Cashier's Checks) | $100,244.86 | |
| 2024 | Joe -> Leila Dowdall (Cashier's Checks) | $77,195.16 | |
| 2024 | Leila Dowdall | $233,333.33 | approx. based on $350k annual "salary" paid to Leila's Bank Account |
| 2025 | Leila Dowdall | $108,356.16 | approx. based on $350k annual "salary" paid to Leila's Bank Account |
| | **Total** | **$918,407.69** | |

29. Dowdall's quest to avoid any sort of accountability has even extended into the Main Case, where he has failed to list as an asset the book of business he took from RPOA and continues to service through Worth Asset Management, LLC, which has already valued by the Panel at $2,766,441, more than half Dowdall's entire debt.

30. Not only does RPOA and the Panel consider a financial advisor's book of business to be a valuable, marketable asset, a Google search indicates that there is a great deal of interest in purchasing books of business just like the one Dowdall failed to list as an asset in this bankruptcy case. For example, an article published on March 3, 2025 lays out how to purchase a book of business the right way. *See* https://smartasset.com/advisor-resources/buying-a-book-of-business-financial-advisor (visited Apr. 24, 2025).

31. Even Worth Asset Management, LLC recognized that Dowdall was bringing a valuable book of business over with him when he joined the firm in early 2021. After all, why else would it include a right of first refusal to buy that book in its March 12, 2021 Investment Advisor Representative Agreement with Dowdall?

> **Sell of IAR's book of business.** In the event IAR wished to sell his or her book of business, IAR will provide written notice to WAM. IAR will grant WAM a first option to bid on the purchase of the book of business. If terms of a purchase and sell are not mutually agreeable within thirty (30) days of notice, IAR is free to solicit bids from outside firms or individuals. Should IAR enter a purchase and sell agreement for his or her book of business with an outside firm or individual, the terms of this Agreement will apply to the IAR and purchaser.

Exhibit 5, at 7 (March 12, 2021 Investment Advisor Representative Agreement).

32. Worth Asset Management also reaffirmed that reality several more times in subsequent agreements with Dowdall:

> **Sell of IAR's book of business.** In the event IAR wishes to sell his book of business, IAR will provide written notice to WAM. IAR will grant WAM a first option to bid on the purchase of the book of business. If terms of a purchase and sell are not mutually agreeable within thirty (30) days of notice, IAR is free to solicit bids from outside firms or individuals. Should IAR enter a purchase and sell agreement for his or her book of business with an outside firm or individual, the terms of this Agreement will apply to the IAR and purchaser.

Exhibit 6, at 7 (August 4, 2023 Investment Advisor Representative Agreement).

> **Salary, Fees and Lien:** EMPLOYER agrees to pay IAE a salary on a pro-rata monthly basis based an annual salary of $350,000. EMPLOYER may pay to IAE a bonus at the sole discretion of EMPLOYER. ==All indebtedness of IAE to EMPLOYER shall be considered to be a prior lien against the book of business of IAE.== After termination of this Employment Agreement, IAE will not receive any salary or fees.

Exhibit 7, at 6 (April 1, 2024 Investment Advisor Employment Agreement) (emphasis added).

33. Dowdall's conduct here warrants a finding of non-discharge-ability of his debts, both to RPOA and any others whose assets he has defalcated and rights he has trampled through the conduct found by the Panel, admitted by Dowdall in the underlying case, and to be found by this Court with respect to the Main Case.

### COUNT I – 11 U.S.C. § 523(a)(6)

34. Section 523 of the Bankruptcy Code provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> …
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ….

11 U.S.C. § 523(a)(6).

35. As set forth and alleged herein, Debtor-Defendant Joseph Anthony Dowdall intended to and did use his payment arrangements with Worth Asset Management, LLC as an instrumentality of fraudulent transfer, in an effort to deceive Creditor-Plaintiff into believing Debtor-Defendant Dowdall had fewer collectible assets than was true.

36. Debtor-Defendant Joseph Anthony Dowdall acted willfully and with malicious intent to cause harm to Creditor-Plaintiff and others by fraudulently and deceptively transferring property beyond their reach.

37. By way of his fraud, Debtor-Defendant Joseph Anthony Dowdall's actions were wrongful and without just cause.

38. As such, Creditor-Plaintiff MMWKM Advisors, LLC has been damaged in an amount not less than the Arbitration Award, which is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(6).

39. This debt should not be discharged.

## COUNT II
*Exception to Discharge Pursuant to 11 U.S.C. § 523(a)(4)*

387. Section 523 of the Bankruptcy Code provides, in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
> …
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

388. A creditor proves defalcation by showing a willful neglect or violation of a fiduciary duty. *See, e.g.*, *Moreno v. Ashworth*, 892 F.2d 417, 418 (5th Cir. 1990) (taking cash advances from a company as CEO, without records of any loan agreements, promissory notes, security agreements, or interest in relation to the transfers and no portion was repaid). As *Moreno* made clear, "a defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement." *Id.* at 421. In this case, there can be no question that Dowdall's breach of his fiduciary duties to RPOA by grooming its clients to leave and eventually taking a book of business

entrusted to his care, worth over $2.7 million, as found by the Panel in the arbitration award. *See* Exhibit 1, at 2. As the Panel found, Dowdall even destroyed evidence when he anticipated litigation, confirming he knew what he did was a betrayal of the trust placed in him and a breach of his fiduciary duty over RPOA's most valuable asset, its book of business.

389. The Debtor committed defalcation with the requisite willful or knowing intent by, among other things:

    i. grooming RPOA clients to leave and thereby secure the book of business entrusted to him for himself;

    ii. refusing to pay the fair-market price for the asset he took for himself;

    iii. destroying evidence of his betrayal of RPOA's trust in him with its most valuable asset, its book of business;

    iv. using RPOA's confidential information to secure the asset of the book of business for himself; and

    v. engaging in deceptive conduct to cover up his betrayal of trust throughout the investigation of his misdeeds.

390. The Debtor further misappropriated RPOA's book of business by agreeing to provide Worth Asset Management, LLC with a right of first refusal in multiple Investment Advisor Representative and Investment Advisor Employment Agreements, including but not necessarily limited to those entered on March 12, 2021 and August 4, 2023 and mischaracterizing his legal dispute with RPOA.

391. The circumstances surrounding the foregoing are indicative of not just willful and knowing conduct, but outright fraud. These actions were part of the Debtor's overall scheme to

take RPOA's most valuable asset—its book of business—without paying the contractually agreed upon or any other price.

392. RPOA has incurred substantial damages in connection with the Debtor's defalcation including by, without limitation, funding more than $1 million of litigation; expending extensive services and time to remedy the Debtor's wrongful conduct; and as further set forth in its proof of claim filed in this bankruptcy, with such amount being nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(4).

393. As such, Creditor-Plaintiff MMWKM Advisors, LLC has been damaged in an amount not less than the Arbitration Award, which should not be dischargeable in bankruptcy.

**WHEREFORE**, Plaintiff RPOA respectfully requests this Court enter a judgment against Debtor determining that the claims RPOA has asserted and/or may assert against the Debtor are not dischargeable pursuant to 11 U.S.C. § 523(a)(4) and awarding any other relief this Court deems just and proper.

## COUNT III
### *Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(2)*

416. Section 727(a)(2) of the United States Bankruptcy Code provides the following exception to the general discharge provisions:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2).

417. Based on the Debtor's actions, including those described above, the Plaintiff allege that the Debtor has, with intent to hinder, delay, or defraud a creditor or an officer of the Estate, transferred, removed, destroyed, mutilated, or concealed, or have permitted to be transferred, removed, destroyed, mutilated, or concealed, property of the Debtor, within one (1) year before the date of the filing of the petition and/or property of the Estate, and after the date of the filing of the petition.

418. By way of example and not limitation, concealed assets include: the book of business that Dowdall pledged a right of first refusal to buy to Worth Asset Managements, LLC in both its March 12, 2021 and August 4, 2023 Investment Advisor Representative Agreements; assets fraudulently transferred to Leila Dowdall.

40. As a result of the Debtor's transfers and concealments, certain assets, namely the income and book of business variously fraudulently transferred, disguised, and withheld by the Debtor, the bankruptcy estate is likely unable to recover and administer assets of the Estate. As such, Creditor-Plaintiff MMWKM Advisors, LLC has been damaged in an amount not less than the Arbitration Award, which is not dischargeable in bankruptcy.

**WHEREFORE**, for the reasons set forth herein, the Plaintiffs respectfully request the Court deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), and for such other relief as is just and proper under the circumstances.

## **REQUESTED RELIEF**

**WHEREFORE**, Creditor-Plaintiff respectfully request this Court enter a judgment against Debtor-Defendant determining that the claims Creditor-Plaintiff have asserted and/or

may assert against the Debtor-Defendants are not dischargeable pursuant to 11 U.S.C. §§ 523 and 727, and awarding any other relief this Court deems just and proper.

This 24th day of April 2025.

*/s/ Patrick Yarborough*
Patrick Yarborough
Texas Bar No. 24084129
patrick@fosteryarborough.com
917 Franklin Street, Suite 220
Houston, Texas 77002

**Counsel for Creditor-Plaintiff
MMWKM Advisors, LLC**
